UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
CLAUDE MASSIAH and NATALIE MIELES,
individually and on behalf all others similarly
situated,
                                Plaintiffs,

            - against -

METROPLUS HEALTH PLAN, INC. and NEW
YORKCITY HEALTH AND HOSPITALS
CORPORATION,

                                Defendants.
---------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

11 Civ. 5669 (BMC)

**COGAN**, District Judge.

Plaintiffs Claude Massiah and Natalie Mieles commenced this class action against defendants MetroPlus Health Plan, Inc. ("MetroPlus") and New York City Health and Hospitals Corporation ("HHC") alleging that defendants failed to pay their marketing representatives overtime wages due under the Fair Labor Standards Act, §§ 29 U.S.C. 201 *et seq.* ("FLSA"), and New York Labor Law §§ 650 *et seq.* Defendants have moved to dismiss plaintiffs' New York Labor Law claim, or in the alternative, for partial summary judgment, on the grounds that HHC and MetroPlus are exempt from New York Labor Law as "political subdivisions" of New York State. Plaintiffs have cross-moved for partial summary judgment, or alternatively, for discovery. For the reasons set forth below, I hold that defendants are not political subdivisions for purposes of the New York Labor Law.

## BACKGROUND

In 1969, New York City established the New York Health and Hospital Corporation via the New York City Health and Hospitals Corporation Act (the "HHC Act") – a state statute which shifted responsibility for New York City's municipal hospitals from the city's Department of Hospitals to a distinct corporate and legal entity. See N.Y. Unconsol. Laws §§7381 *et seq.* The purpose of the statute was, *inter alia,* to create "[a] system permitting legal, financial and managerial flexibility," which would improve the quality of public healthcare. N.Y. Unconsol. Laws § 7382. The HHC Act enabled a separate HHC budget and allowed HHC to independently contract; execute leases and other agreements; apply for and accept "grants of money, property, services . . . or other aid," N.Y. Unconsol. Law § 7385(15); and establish an autonomous board. N.Y. Unconsol. Law § 7385(5). HHC has the power to amend its by-laws, rules, and regulations, N.Y. Unconsol. Law § 7385(3); hire its own employees; and control its employees' contract terms and conditions. N.Y. Unconsol. Law § 7385(12). Furthermore, the Act gave HHC the ability to sue or be sued, to borrow money, and to acquire or sell property. N.Y. Unconsol. Law § 7385(1), (4), (6). HHC also has its own separate legal counsel and department.

Since 1969, HHC has grown into a $6.7 billion healthcare delivery system. The entity is a public benefit corporation intended to "provide health and medical services and health facilities . . . for the benefit of the people of the state of New York and the city of New York." See N.Y. Unconsol. Laws § 7382. According to its website, HHC fulfills this mission by providing "medical, mental health, and substance abuse services through eleven acute care hospitals, four skilled nursing facilities, six large diagnostic and treatment centers and more than 70 community based clinics." Approximately 35% percent of people served by HHC are uninsured.

The enabling act allows HHC to fulfill its purpose "through one or more wholly-owned subsidiary public benefit corporations . . . ." N.Y. Unconsol. Laws § 7385(20)(a). One of these subsidiaries is MetroPlus – a public benefit corporation which provides low or no-cost health insurance to eligible New York City residents. MetroPlus is one of a number of private for-profit and not-for-profit companies that enroll eligible low-income individuals into their health plans and provide insurance access to the uninsured and indigent. The corporation is now the second-largest health insurance company in the New York managed care market, insuring more than 400,000 individuals. Along with contributions from the state and federal governments, MetroPlus funds HHC with revenue from third party insurance providers. In 2011, MetroPlus contributed about $1.2 billion to HHC's budget, while $5.1 billion of HHC's total operating revenue came from third party sources, including Medicaid and Medicare payments, and $269,000 was derived from State or City government appropriations.

Plaintiffs are employed by MetroPlus as marketing representatives. Their responsibilities include educating Medicaid or Medicare-eligible individuals as to their health insurance options and helping applicants to complete their health insurance applications. Plaintiffs allege that MetroPlus requires its marketing representatives to work long hours, but does not honor New York Labor Law overtime pay requirements. In fact, plaintiffs contend that defendants require their marketing representatives to endorse time sheets which inaccurately represent the number of hours they have actually worked, and that the marketing representatives are forbidden to submit accurate time sheets.

## DISCUSSION

New York Labor Law § 651(5) exempts from its wage requirements those employed "by a federal, state or municipal government or political subdivision thereof." However, the statute

3

does not define the term "political subdivision." Similarly, the HHC Act is silent regarding how HHC should be defined, except it explicitly provides that HHC shall be treated as a political subdivision for the purposes of two state finance laws not relevant to this action. N.Y. Unconsol. Laws § 7384-a.

The authority of the New York Legislature to create public benefit corporations is set forth in the New York State Constitution. See, N.Y. Const. art. X, § 5. The New York Court of Appeals, however, has made it clear that not all public benefit corporations created pursuant to this authority are to be regarded as arms or agencies of the state for all purposes. As the Court of Appeals noted in John Grace & Co., Inc. v. State University Construction Fund, 44 N.Y.2d 84, 88, 404 N.Y.S.2d 316, 317 (1978):

> We begin our inquiry ... with the proposition that public benefit corporations ... created by the State for the general purpose of performing functions essentially governmental in nature, are not identical to the State or any of its agencies, but rather enjoy, for some purposes, an existence separate and apart from the State, its agencies and political subdivisions . . . .

In John Grace, the issue was whether a contractor was entitled to a contract adjustment based on legislation permitting such adjustments in contracts with "the State of New York." Id. at 87, 404 N.Y.S.2d at 316. The plaintiff's counter-party, the State University Construction Fund, was a public benefit corporation formed to receive and administer funds for construction on state university campuses. In holding that the Fund was not to be treated as a state agency for purposes of these adjustment statutes, the Court of Appeals noted the very different requirements for awarding and administering construction contracts between the Fund and the State itself. The Court considered the Fund's "powers, functions and obligations," and that it had a "separate existence, independently transact[ed] its business, and "hire[d] and compensate[d] its own personnel outside the civil service system," as warranting the conclusion that it was not covered

4

as an arm of the state under the particular statutes at issue. Id. at 89, 90, 404 N.Y.S.2d at 318, 319. "The mere fact that [an entity] is an instrumentality of the State, and as such, engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies...." Id. at 88, 404 N.Y.S. 2d at 318.

In Dormitory Authority of State of New York v. Span Electric Corp., 18 N.Y.2d 114, 271 N.Y.S.2d 983 (1966), the Dormitory Authority argued that it was akin to a state agency, and thus was not bound by an arbitration clause in a construction contract it had signed. In reaching the conclusion that it was not, in fact, like a state agency, the Court of Appeals focused on the Authority's independent hiring, executive compensation, ability to purchase its own real estate, and numerous other indicia of independence.

The Court of Appeals reached the opposite outcome in Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987), where the issue was whether the LIRR could be held liable for punitive damages. The Court summarized the framework for the analysis thusly: "[A] particularized inquiry is necessary to determine whether – for the particular purpose at issue – the public benefit corporation should be treated like the State." Id. at 387, 521 N.Y.S.2d at 655. The Court found that the LIRR should share the State's immunity from punitive damages because: (a) the LIRR provided "an essential public service;" and (b) nearly half of the LIRR's funding came from public sources, as did a "large measure" of the funding for the construction project at issue in the case.

The Court of Appeals has never been much more specific in addressing this issue beyond rejecting the notion that all public benefit corporations are subject to all state laws, and that the inquiry is "particularized." But the available perspectives are not that numerous, and they suggest several discrete areas of inquiry. Principally, "if a particularized inquiry demonstrates

5

that "the [enabling statutes] imbue [the entity] with such a degree of identity as to be considered an integral part of the State qua State," a court may find that a public benefit corporation should be deemed a political subdivision. John Grace, 44 N.Y.2d at 88, 404 N.Y.S.2d at 318.

One factor to consider in deciding whether a public benefit corporation is akin to the state is the degree to which it dominates the service area in which it operates. That is, is it the sole provider of the service, which would tend to make it look like a state agency, or is it one of a number of providers, which would cause it to resemble a private provider? Additionally, when considering employment protection statutes like New York Labor Law § 650 *et seq.*, a court should look to the "powers, functions, and obligations" of the corporation; specifically whether, with respect to these characteristics, the corporation is similar to its counterparts in the private or not-for-profit sector. If it is, those similarities will weigh against treating the corporation like the state. Finally, a court should consider the aims and goals of the particular New York statute in question, and determine whether there is any reason why the corporation should be exempted from compliance.

In answering these questions, I see no reason why HHC and MetroPlus should be excused from paying their employees the wages required by New York law. First, unlike the Long Island Railroad, which, by the time of Clark-Fitzpatrick, had become the sole provider of commuter rail services between Long Island and New York City, over fifty hospitals can be found in New York City – only eleven of which are run by HHC. HHC employees provide the same kinds of healthcare services as do private for-profit and not-for-profit hospitals. With only 35% of its resources going toward treating the uninsured, HHC's hospitals no longer cater primarily to an indigent population that cannot access alternative healthcare. Additionally, MetroPlus shares the field with other private insurance providers like Fidelis Care New York,

HealthFirst PHSP, Inc., and Health Plus PHSP, Inc., which also enroll Medicaid or Medicare eligible individuals assigned to them by the State Department of Health.

Secondly, HHC and MetroPlus differ significantly from state agencies in their powers, functions, and obligations. HHC has the power to transact its own nongovernmental business separately from the city. It may execute its own contracts, leases, and other agreements, N.Y. Unconsol. Law § 7385(5), and has the substantial ability to hire and control its personnel. N.Y. Unconsol. Law §§ 7385(3), 7381(12). HHC features an independent board of directors which includes non-City employees, and it is served by its own separate legal counsel and department. In fact, HHC is a distinct corporate and legal entity from the City and enjoys substantial budgetary independence. The fact that approximately 65% of patients served by HHC are insured suggests that revenue is largely derived from third parties in the form of Medicaid and Medicare reimbursements rather than from the city. In fact, according to the New York City Council's HHC Budget Overview for 2011, out of HHC's $6.7 billion operating budget, about 76.8% was derived from third party revenue, while 18.5% came from MetroPlus Premiums. Only 4% of HHC's budget was funded by State or City governments. See Latonia McKinney, Pamela Corbett, Hearing on the Mayor's Fiscal Year 2012 Preliminary Budget, New York City Council, 5 (March 28, 2011), http://council.nyc.gov/html/budget/PDFs/2012/hhc_819.pdf.

In addition to analyzing the extent to which an entity resembles the state, the court must consider whether the aims and goals of the statute are furthered by defining a corporation a given way. See e.g., John Grace, 44 N.Y.2d at 88-90 (holding that the State University Construction Fund was not a political subdivision of the State "based on a particularized inquiry into the nature of the instrumentality *and the statute*." Emphasis added). In Clark-Fitzpatrick, for example, the court held that although "[t]he LIRR, of course, is not itself the State or one of its

7

political subdivisions," it should be treated as such because like the State, innocent taxpayers would ultimately bear the costs of punitive damages against the LIRR, and thus, the deterrence and disciplinary goals of punitive damages would be undermined. In other words, the purposes of punitive damages were not furthered by penalizing the LIRR in that instance. In this case, however, no such conflict exits between the goals of New York Labor Law and its application to HHC. As discussed above, HHC no longer performs a unique government function that would merit its exemption from a law with obvious countervailing policy objectives. Thus, there is no reason that HHC, like its counterparts in the private sector, should not be required to pay its employees according to New York Labor Law.

Finally, it seems clear that if the New York legislature had intended to exempt HHC and MetroPlus employees from the protection of New York Labor law, it could have said so expressly (and can say so expressly at any time if it chooses to do so), as it has done with regard to state finance laws. It is no answer to say that HHC provides an essential service. Of course it does. If a state sponsored agency does not provide an essential service, it likely has no business providing it at all. For that reason, it does not matter that the healthcare system in New York City would collapse without HHC; it would undoubtedly collapse with equally or more disastrous consequences if the private and not-for-profit hospitals in the City stopped providing services.[1]

When a corporation receives substantial private funding, it may freely contract with its own employees and other entities with little restraint, and is subject to obligations similar to

---

[1] Both sides appear to misunderstand Faculty Student Association of State University of Oneonta v. Ross, 54 N.Y.2d 460, 446 N.Y.S.2d 205 (1981). That decision has nothing to do with this case because it involved a not-for-profit corporation formed under New York's Not-For-Profit-Corporation Law, N-PCL § 101 *et seq.*, not a public benefit corporation formed by enabling legislation under the New York Constitution, Article X, Section 5. It is quite obvious that a group of private individuals cannot form a not-for-profit corporation and then, contending that it "benefits the public," pay its employees less than New York law requires of all corporations.

8

those of a private company, it should not be permitted to take advantage of statutory exemptions intended to benefit entities offering essential services that traditionally fall under the auspices of the government. Although the purpose of HHC is to provide a public benefit, that alone, without other indicia of State identity, is insufficient to support a finding that HHC and MetroPlus should be treated as political subdivisions in this context. The Legislature, through the HHC Act, pointedly created an entity with a distinct corporate, legal, and financial identity in order to reap the benefits of private management for its city's hospitals. Having taken advantage of that benefit, it should not avoid the costs associated with independence from the State.[2]

## CONCLUSION

Defendants' motion for summary judgment is denied.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
April 9, 2011

---

[2] I recognize that this decision is contrary to that reached in Drayton v. MetroPlus Health Plan, 791 F.Supp.2d 343 (S.D.N.Y. 2011). But Drayton was principally based upon authorities that never considered the question at issue. See Szucs v. Committee Of Interns & Residents, 34 F. Supp. 2d 224, 225 (S.D.N.Y. 1999) (Court defines HHC as a public employer but no discussion of HHC's status as a political subdivision); Muhlrad v. Mitchell, No. 96 Civ. 3568, 1997 WL 182614, at 3-4 (S.D.N.Y. 1997) ("political subdivision" issue was conceded by plaintiff); Bender v. N.Y.C. Health & Hospitals Corp., 38 N.Y.2d 662, 668, 382 N.Y.S.2d 18, 21 (1976) (referring to HHC as a "subdivision" without analysis). See also Council of the City of New York v. Giuliani, 93 N.Y.2d 60, 69, 687 N.Y.S.2d 609, 613 (1999) ("municipal hospitals . . . remain a *governmental responsibility* and would be operated by HHC as long as HHC remained in existence") (emphasis added); Farbman Sons, Inc. v. N.Y.C. Health & Hospitals Corp., 62 N.Y.2d 75, 80, 476 N.Y.S.2d 69, 71 (1984) (HHC deemed to be a "government agency" without analysis).